Steve Schatz, Esquire
Weinstein and Associates
41 South Haddon Avenue
Haddonfield, NJ 08033

L. Kenneth Chotiner, Esquire
The Chotiner Firm
1818 Market Street, Suite 3620
Philadelphia, PA 19103

Attorneys for Plaintiff, Paul Walker

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL WALKER <br> **Plaintiff** | CIVIL ACTION <br><br> No.: 04-CV-351 |
| Vs. | |
| POLICE OFFICER ANDREW JACQUES; THE ATLANTIC CITY POLICE DEPARTMENT; and, THE CITY OF ATLANTIC CITY <br><br> **Defendants** | JURY TRIAL DEMANDED |

**PLAINTIFF, PAUL WALKER'S, BRIEF IN OPPOSITION TO
DEFENDANT, THE CITY OF ATLANTIC CITY'S,
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Steve Schatz, Esquire
Weinstein and Associates
41 South Haddon Avenue
Haddonfield, NJ 08033

L. Kenneth Chotiner, Esquire
The Chotiner Firm
1818 Market Street, Suite 3620
Philadelphia, PA 19103
Attorneys for Plaintiff, Paul Walker

Steve Schatz, Esquire
Weinstein and Associates
41 South Haddon Avenue
Haddonfield, NJ 08033

L. Kenneth Chotiner, Esquire
The Chotiner Firm
1818 Market Street, Suite 3620
Philadelphia, PA 19103

Attorneys for Plaintiff, Paul Walker

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL WALKER<br><br>Plaintiff<br><br>Vs.<br><br>POLICE OFFICER ANDREW JACQUES; THE ATLANTIC CITY POLICE DEPARTMENT; and, THE CITY OF ATLANTIC CITY<br><br>Defendants | CIVIL ACTION<br><br>No.: 04-CV-351<br><br>JURY TRIAL DEMANDED |

BRIEF IN OPPOSITION TO
DEFENDANT, THE CITY OF ATLANTIC CITY'S,
MOTION FOR SUMMARY JUDGMENT

1. PRELIMINARY STATEMENT

This matter arises out of a series of incidents involving Defendant, Police Officer Andrew Jaques ("Officer Jaques" or "Jaques"), over an eleven month period, which culminated in an altercation between Defendant, Jaques, and Plaintiff, Paul Walker, on October 23, 2002. Plaintiff's claims against Defendants, The City of Atlantic City (the "City") and The Atlantic City Police Department ("ACPD"), are based upon Defendant, Jaques, violations of Plaintiff's Constitutional rights pursuant to 42 U.S.C. § 1983 and various state law claims. The City filed a Motion for Summary Judgment asking this Honorable Court to

dismiss all of Plaintiff's claims against it.[1] But, as Your Honor will see, Plaintiff has discovered sufficient facts from which a reasonable jury could infer that:

- The prior written complaints against Defendant, Officer Jaques, are sufficient to prove that the City, the ACPD, and, its Chief of Police, knew, or should have known, of Defendant, Officer Jaques', violent behavior.
- The ACPD's procedures to investigate allegations of police misconduct lacked any substance.[2] ACPD's Internal Affair's department was nothing more than a façade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers.
- ACPD's Internal Affairs Investigators lacked the necessary training to conduct meaningful investigations, which helped perpetuate the City's custom of acquiescing in the excessive use of force by its police officers.
- The City's superficial Internal Affairs' investigations and its failure to properly train Internal Affairs' Investigators led to a lack of meaningful supervision and failure to discipline.
- Defendant, Officer Jaques, was acting under the color of law when he assaulted plaintiff because he identified himself to Plaintiff as an off-duty police officer using his Police Identification and Badge and ordered plaintiff to cease and desist.

2.  PROCEDURAL HISTORY

On January 23, 2004, Plaintiff filed a Complaint in District Court. In Count One, Plaintiff alleged excessive use of force against Defendant, Officer Jaques, pursuant to 42 U.S.C. § 1983. In Count Two Plaintiff alleged false arrest and imprisonment against Defendant, Officer Jaques, pursuant to 42 U.S.C. § 1983. In Count Three Plaintiff alleged assault and battery against Defendant, Officer Jaques, individually pursuant to state law. In Count Four Plaintiff alleged false arrest and illegal imprisonment against Defendant, Officer Jaques, individually pursuant to state law. In Count Five Plaintiff alleged a failure to investigate, train, supervise, and/or discipline against Defendant, the City of Atlantic City, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988. In Count Six Plaintiff alleged state law claims of negligence against Defendant, the City of Atlantic City, for its failure to investigate, train, supervise, and/or discipline.

Defendant, the City of Atlantic City, filed a Motion for Summary Judgment requesting the claims against it be dismissed, which is now before this Honorable Court.

---

[1] Plaintiff stipulated that he is not seeking any emotional or punitive damages against the City defendants and consents to the dismissal of such claims.
[2] "Whether [investigatory] procedures [have] substance [is] for the jury's consideration." Beck v. Pittsburgh, 89 F.3d 966 at 974 (3rd.Cir. 1996).

Page 2

3.     PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS

Plaintiff, Paul Walker, hereby incorporates his Counterstatement of Undisputed Material Facts as if fully set forth herein.

4.     LEGAL ARGUMENT

Summary judgment in not favored in doubtful cases. Kilmer v. Walsh, 189 F.Supp.2d 237 (M.D. Pa 2002). A party seeking summary judgment must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c); Celotex Corp. v. Catrett, 477 US 317, 322 (1986). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. Hancock Indus. v Schaeffer, 811 F.2d 225 (3d Cir. 19 7). To earn a summary decision, the moving party must merit judgment as a matter of law upon genuinely indisputable material facts. Barletta v. Golden Nugget Casino, 580 F.Supp. 614 (D.N.J. 1984). Only a clear showing of authentic non-disputed facts satisfies the Rule 56(c) standard demanding the absence of triable fact issues. Ely v. Hall's Motor Transit Co, 590 F.Supp 62, 66 (3d Cir. 1976). The role of the court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 249 (1986).

Summary Judgment is inappropriate when a case will turn on credibility determinations[3] or on a state of mind. Kraeger v. Nationwide Mutual Insurance Company, 1996 WL 711488 (E.D. Pa 1996). Issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, because such issues must often be resolved on the basis of inference drawn from the conduct of the parties. Riehl v. Travelers Ins. Co., 772 F.2d 19 (3rd Cir 1985).

A.     **PLAINTIFF'S MONELL CLAIMS AGAINST THE CITY OF ATLANTIC CITY**

Plaintiff's municipality liability claims are based upon ACPD's custom of tolerating officer misconduct and its failure to properly train its Internal Affairs ("IA") Investigators. The customs and inadequate training performed by the ACPD resulted in meaningless investigations, which lead to a lack of supervision and discipline of ACPD Officers, including

---

[3] Please note that the expert report Bryon K. Marshall, M.P.A., J.D., on behalf of the City of Atlantic City, has made numerous credibility determinations concerning Andrew Jacques. Expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible Nimely v. City of New York, 414 F.3d. 381 (2nd Cir. 2005). Clearly, summary judgment is not appropriate based upon the credibility determinations made by Mr. Marshall in his expert report.

Defendant, Officer Jaques. A reasonable jury could infer that this lack of supervision and discipline caused Plaintiff's injuries.

To establish Section 1983 liability on such a governing body as the City of Atlantic City, by and through the ACPD, a plaintiff must identity either a "policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or "constitutional deprivations visited pursuant to governmental 'custom' even though the custom has not received formal approval through the body's official decision making channels." Monell v. Department of Soc. Serv., 436 U.S. 658, 98 S. Ct. 2018 (1978) The Third Circuit explained that the custom or policy may be established: (1) when a decision maker[4] possessing final authority to establish municipal policy with respect to the action, issues an official proclamation, policy or edict or (2) through a 'course of conduct...when, though not authorized by law, such practices of the state officials [are] so permanent and well-settled as to virtually constitute law. Andrews v. City of Philadelphia, 895 F.2d 1469 (3rd Cir 1980).

Moreover, to establish custom, there should be evidence of notice that a constitutional violation could occur. Bryan County Commissioners v. Brown, 520 U.S. 397, 117 S. Ct. (1997). Generally, notice is established through a pattern of known prior constitutional violations. See Brown, 520 U.S. at 409-19; Beck v. City of Pittsburgh, 89 F.3d 966 (3rd Cir. 1996) cert denied, City of Pittsburgh v. Beck, 519 U.S 1151 (1977) (holding that pattern of written complaints of violence against an officer is sufficient for reasonable jury to conclude policymaker knew or should have known of violations); Bielevicz v. Dubinon, 915 F.2d 845 (3d Cir 1990) (policymakers must be aware of similar unlawful conduct in past but fail to take action to prevent future violations). The "key to holding a municipality liable under a policy or custom theory" is that the policymaking official(s) knew, or should have known, about the illegal practices, and therefore, tacitly authorized a custom of tolerating their officers supposedly illegal activities. See Allen v. City of Philadelphia, 1997 U.S. Dist. Lexis 14200, 1997 WL 587366 (E.D. Pa. 1997).

While municipal liability under Section 1983 originally hinged on affirmative policies, or customs, modern jurisprudence has extended it to a city's failure to train, supervise and

---

[4] The person who is the policymaker is a question of state law and the court must decide which official has final, unreviewable discretion to make a decision or take an action. City of St Louis v. Praprotnik. 485 U.S 112, 198 S. Ct. 915 (1988); Andrews v. City of Philadelphia, 895 F.2d 1469 (3rd Cir. 1990).

discipline its officers. City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197. The Supreme Court in Harris stated that:

> [I]t may happen in the light of the duties assigned to the specific officers or employees that need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need.
>
> Id.

In order to establish "deliberate indifference" the alleged failure to train must reflect a "deliberate" or "conscious" choice by the municipality. Id. The Court in Harris identified two situations which would justify a finding of liability under the failure to train theory: (1) failure by a city to act in response to a complaint of constitutional violations by its officers or (2) failure to provide adequate training in light of foreseeable serious consequences that could result from the lack of instruction. Id. Moreover, the "deliberate indifference" standard has been applied in other policy or custom contexts, including failure to supervise, discipline and investigate. Beck v. City of Pittsburgh, 89 F.3d 966 (3rd Cir. 1996) cert denied, City of Pittsburgh v. Beck, 519 U.S 1151 (1977); Gorman v. Twp. Of Manalapan, 47 F.3d 628 (3rd Cir. 1995).

In Beck, the Third Circuit held that when defendant police officers had been subject to prior complaints of excessive use of force and verbal abuse, there was sufficient evidence of a pattern of violent and inappropriate behavior so as to allow an inference that the Pittsburgh Police Department knew of and tolerated such conduct. Beck v. City of Pittsburgh, 89 F.3d 966 (3rd Cir. 1996) cert denied, City of Pittsburgh v. Beck, 519 U.S 1151 (1977). The Court in Beck v. City of Pittsburgh, held "[t]he investigative process must be real [and] [m]ust answer to citizens by providing at least a rudimentary chance of redress when injustice is done." Beck v. City of Pittsburgh, 89 F.3d 966 (3rd Cir. 1996) cert denied, City of Pittsburgh v. Beck, 519 U.S 1151 (1977). Furthermore, the Court in Beck stated that "[t]he mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." Id.

Finally, to maintain a Section 1983 municipal liability claim, a plaintiff must demonstrate a sufficient degree of evidence. See Oklahoma City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427 (1985). In Tuttle, the Supreme Court defined that body of proof required:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incidents includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

> attributed to a municipal policymaker.... But where the policy
> relied upon is not itself unconstitutional, considerably more
> proof than the single incident will be necessary in every case
> to establish both the requisite fault on the part of the
> municipality and the casual connection between the policy
> and the constitutional deprivation.
>
> Oklahoma City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427 (1985).

In this case, plaintiff has discovered numerous facts from which a reasonable jury could find in favor of his Monell claim under the following theories.

### 1. The Atlantic City Police Department's Custom of Tolerating Officer Misconduct.

In Beck, the Third Circuit held that mere department procedures to receive and investigate complaints do not shield a city from liability. (89 F.3d 966 at 974.) "It is not enough that an that an investigative process be in place... : The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." (Id. (citations omitted.))

Here, the ACPD had policies and procedures in place, which were designed to prevent improper conduct and/or performance. But, as Your Honor will see, those policies and procedures were ignored. And a reasonable jury could easily conclude that this ignorance was the cause of plaintiff's injuries.

ACPD's own polices and procedures state that "[r]ecent court decisions, particularly those involving federal civil rights lawsuits which allege a deliberate indifference on the part of the agency towards citizen complaints, have made it clear that law enforcement agencies have a duty to monitor the behavior of their employees." (Exhibit "L," at 1222.). "Any mechanism or procedure established by a law enforcement agency to monitor and evaluate the behavior and performance of individual police officers must have as two of its linchpins quality supervision and an objective and impartial internal affairs process. ...Emphasis should be placed on anticipating problems among officers before they result in improper performance or conduct. Supervisors are expected to recognize potentially troublesome officers, identify training needs of officers, and provide professional support in a consistent and fair manner." (Id.)

The ACPD utilized a computerized "early warning system" to help monitor its employees, including police officers (i.e. Andrew Jacques). According to the ACPD's policies and procedures, "[a]n early warning system should be designed to identify any pattern or

practice by any member of the agency which warrants intervention or remediation before it develops into a glaring problem. (Exhibit "L" at 1222-23.)

As stated by the court in Beck, a pattern of written complaints of violence against an officer is sufficient for a reasonable jury to conclude a policy maker knew or should have known of violations. ACPD's policies and procedures go further than the said policies and procedures in place by the defendant in the Beck case. The ACPD policies and procedures in regard to the issues involving the conduct of its police officers provides, in relevant part, that:

> Many different measures of officer performance can be regularly examined for any of these patterns or practices. Some of the measures that should be considered for their suitability for inclusion in the "early warning system" are:
>
> - Motor vehicle stop data
> - Search and seizure data
> - Internal complaints, regardless of outcome
> - Civil actions filed, regardless of outcome
> - Incidents of force usage, including firearms discharges and use of non-deadly force
> - Claims of duty-related injury
> - Arrests for resisting arrest
> - Arrests for assault on a law enforcement officer
> - Criminal investigations or complaints made against the member
> - Incidents of arrested persons injured
> - Vehicle pursuits
> - Vehicular accidents
> - Cases rejected or dismissed by the prosecutor
> - Evidence suppressed by the court.
>
> (Exhibit "L" at 1223)

But, according to the policymaker of the ACPD, Chief Arthur Snellbaker, the ACPD's computerized early warning system "was an unmitigated disaster." (Dep. Chief Snellbaker 129:11-22) According to the testimony of Chief Snellbaker, the employee in charge of the system could not get it to work right. (Chief Snellbaker Dep. 130:4-9, Exhibit "J.") Chief Snellbaker went on to state that the system was giving unclear reports and, was crashing frequently. (Id.) Above all, Chief Snellbaker testified that the "computerized early warning

system was "abandoned... in fairly short order... ." (Id.) There is no evidence that it was replaced.

Moreover, like the defendant in Beck, the ACPD Internal Affairs Unit does not consider prior citizen complaints of an officer's excessive use of force as relevant in assessing a pending complaint. Sergeant Hanlin, the City of Atlantic City's Corporate Designee in regard to issues concerning the Internal Affairs/Professional Standard Unit, testified that Internal Affairs never considers prior Internal Affairs' investigations in determining or making recommendations regarding a current complaint. (Sgt. Hanlin Dep. 84:23-85:3, Exhibit "I.") Despite having worked in Internal Affairs for over five years, Sgt. Hanlin does not even know if the Internal Affairs Unit utilized any type of early warning system, even though Chief Snellbaker testified that one existed. (Sgt. Hanlin Dep. 104:6-8, Exhibit "I.") Accordingly, ACPD Internal Affairs did not notice, let alone report, patterns of cases. Above all, the ACPC, by and through it officers, cannot even agree as to whether there was an early warning system in place to deter an incident like to the one involving Officer Jacques and plaintiff.

Because it did not utilize an early warning system or consider prior incidents, the ACPD did not recognize Defendant Officer Jacques' pattern of conduct that warranted intervention. In this case, a frightening pattern developed from which a reasonable jury could conclude that the Chief of Police, Arnold Snellbaker and the ACPD knew, or should have known, of Officer Jacques' violent behavior. In Beck, the Third Circuit found that five complaints of violent behavior and verbal abuse over a three year period prior to the subject incident was sufficient to sustain a Monell claim. (Beck at 973.) In this case, Officer Jacques received four complaints of violent behavior and verbal abuse within eleven month period prior to the incident involving the plaintiff.

In December of 2001, Defendant, Andrew Jacques, was investigated for an incident of Domestic Violence involving another officer, who was also his girlfriend. Both officers were sent for an evaluation with the "city's psychiatrist, Dr. Garry Glass." (Exhibit "O" at 0049.) Dr. Glass cleared both officers to return to duty, but "both officers would have to turn in their duty weapons at the end of the shift." (Id.) According to the documentation provided by the ACPD, Dr. Glass ordered that "neither would be allowed to carry a weapon off-duty." (Id.) It is apparent from the documentations provided by the ACPD that Dr. Glass's orders were not acceptable to Chief Snellbaker. (Id.)

In fact, Chief Snellbaker ordered the officers to be re-evaluated within a week of Dr. Glass's orders.[5] (Id. and Exhibit "P" at 0058). It should come as no surprise that both officers were cleared to return to work without any special restrictions after they were re-evaluated pursuant to the Chief's Order. (Exhibit "O" at 0049.) Thereafter, the investigation concerning Officer Jacques and his girlfriend were "closed out."

Little more than a month after he was cleared by Chief Snellbaker's ordered reevaluation, Jaques received another complaint involving an incident of verbal abuse, which occurred on February 6, 2002. (Exhibit "Q" at 0006-8.) The complainant accused Officer Jaques of acting unprofessionally and yelling obscenities during a routine traffic stop, which resulted in a complaint and investigation. (Id. at-0014). That complaint was "not sustained—the investigation failed to disclose sufficient evidence to clearly prove or disprove the allegation." Officer Jacques, however, "should have called for back-up to the scene and requested a marked unit to assist." (Id. at 0006-8.)

On May 31, 2002, less than four months after the incident on February 6, 2002, Officer Jaques was involved in another incident involving violent behavior and verbal abuse, which resulted in another complaint. This time the complainant stated that Officer Jaques told complainant to get out of his car so they could fight. (Exhibit "R.") Moreover, the complaint documents state that Officer Jaques told the complainant that every time he sees the complainant, he would issue complainant a ticket. (Id.) Due to the nature of the complaint, the investigation was referred to Officer Jaques Commanding Officer for review and recommendation. (Id. at 0092.) Based on the facts gathered in the investigation, "[Officer Jaques was] exonerated of the charge stated in [the] complaint, i.e. the alleged incident did occur, but the actions of the officer were justified, lawful and proper." (Id. at 0065.)

On July 26, 2002, less than two months after the May 31, 2002 incident, Officer Jaques was accused of using excessive force in effectuating an arrest of a juvenile, which resulted in another complaint. (Exhibit "S.") Again Officer Jaques was exonerated—"The alleged incident did occur, but the actions of the officer were justified, proper, and legal." (Id.)

On October 23, 2002, which is within three months of the July 26, 2002 incident and eleven months of four prior incident and/or complaints, Officer Jaques assaulted plaintiff with his nightstick. Plaintiff received a laceration to his forehead which required eleven

---

[5] Despite repeated requests for copies of the psychiatric report, defendants have not produced it.

staples to close. (Exhibit "C.") Even though Officer Jaques was charged with DUI and aggravated assault, he remained on the street and in uniform. On October 25, 2002, another complainant accused Officer Jaques of threatening to mace her while she was hand-cuffed.[6] (Exhibit "X" at 0198.) Defendant, Jaques', uncle, Sergeant McCausland, who is a member of ACPD's Internal Affairs Unit, participated in that investigation. (Id. at 0207.)

It is crystal clear that the ACPD's Internal Affairs investigative process evinces a pattern of conduct which is so permanent and well-settled that it has the force of law. Investigations fail to consider relevant facts, such as prior complaints. Moreover, the abandonment of the early warning system demonstrates a deliberate indifference to a citizen's civil rights, including Plaintiff, Paul Walker. Accordingly, Defendant's, the City of Atlantic City, Motion for Summary Judgment should be denied, as there are numerous issues of material fact which support claims under Monell and the prodigies that followed, including Beck, Harris and Bielevicz.

### 2. The Atlantic City Police Department's Failure to Train, Supervise, and Discipline its Police Officers.

The above facts also support municipal liability under the theory that the City of Atlantic City has failed to train, supervise, and discipline its officers, including Andrew Jaques. The failure to properly train Internal Affairs' Officers along with the abandonment of the "early warning system" led to a lack of meaningful supervision and failure to discipline. See Beck v. City of Pittsburgh, 89 F.3d 966 (3rd Cir. 1996) cert denied, City of Pittsburgh v. Beck, 519 U.S 1151 (1977)("[t]he mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens).

The facts of this case demonstrate a failure to properly train IA Investigators. According to the ACPD Policies and Procedures, Internal affairs investigators should receive training in internal affairs and disciplinary procedures, initially and on an ongoing basis. (1188.) But they do not. According to the testimony of Sgt. Hanlin, Internal Affairs Officers receive only initial training, an eight-hour seminar. (Sgt. Hanlin Dep. 35:17-21, Exhibit "I.").

In fact, IA Investigators do not even know the burden of proof that is required to sustain complaints. Although the City's Corporate Designee regarding Internal Affairs testified that the burden was a "preponderance of the evidence," he did not know what that meant. (Sgt. Hanlin Dep. 81:12-16, Exhibit "I.") All Sgt Hanlin knows, according to his own testimony,

---

[6] This post-incident complaint should be admissible under F.R.E. 404(b) to demonstrate the lack of any meaningful investigative and/or disciplinary procedure in the Atlantic City Police Department.

is that "[i]t is less than beyond a reasonable doubt." (Sgt. Hanlin 81:17-24, Exhibit "I.") But Sgt. Hanlin does not know how much less a preponderance of the evidence is compared to beyond a reasonable doubt. (Sgt. Hanlin Dep. 82:3-8, Exhibit "I.")

Moreover, IA investigators do not see the forest through the trees despite their duty to discover patterns of misconduct. <u>Internal Affairs Investigators ignore prior complaints in assessing a pending complaint.</u> (Sgt. Hanlin Dep. 84:18-85:3, Exhibit "I.") This is the same ignorance that the Third Circuit found actionable against the municipality in the case of <u>Beck v. City of Pittsburgh</u> relating to a claim under 42 U.S.C. Section 1983.

Additionally, IA Investigators were not trained in the use of the computerized early warning system. The City's Corporate Designee regarding the Internal Affairs Unit did not even know that there was one. (Sgt. Hanlin Dep. 104:6-8, Exhibit "I.") As previously noted, the computerized early warning system was abandoned. (Snellbaker 130:4-9, Exhibit "J."). According to the documentation provided, the purpose of the early warning system, which was abandoned by the ACPD, "is to detect patterns and trends before the conduct escalates into more serious infractions. ...The primary intent of an early warning system is to address potential problems through the use of appropriate management and supervisory strategies before formal discipline is warranted." (Exhibit "L" at 1224.) Moreover, "[i]n addition to the regular, automated review by the early warning system, the internal affairs unit should query the early warning system and review an individual employee's history anytime a new complaint is made. Using this information and their experience, internal affairs staff may be able to identify employees who may need counseling, training or other remediation even before such is indicated by the early warning system's ongoing data review." (<u>Id</u>.)

Without this "early warning system" and the proper training of its IA Investigators, the ACPD lost several opportunities to intervene and remediate Officer Jaques behavior before he assaulted plaintiff. This should not be surprising, as the ACPD's Policies and Procedures notes that the disciplinary process "is one of the most frequently neglected processes within many law enforcement agencies." (Exhibit "K.")

The aforementioned lack of training, supervision, and discipline, fits within the parameters established in <u>City of Canton v. Harris</u>, where a municipality would neglect to provide adequate training in light of foreseeable serious consequences that could result from the lack of instruction to IA Investigators. Accordingly, Defendant's, the City of Atlantic City, Motion for Summary Judgment should be denied, as there are numerous issues of material

Page 11

fact which supports a claim under Monell and the prodigies that followed, including Beck, Harris and Bielevicz.

### B. COLOR OF LAW

"Acting under color of law" simply means acting in one's capacity as a police officer. Graham vs. Connor, 490 U.S. 386 (1989). An off duty police officer who purport to exercise official authority will generally be found to have acted under color of law. Barna v. City of Perth Amboy[7], 42 F.3d 809 (3d Cir. 1994). As stated in Barna, [m]anifestations of such pretended authority may include flashing a badge, identifying oneself as a policy officer, placing an individual under arrest, or intervening in a dispute involving other pursuant to a duty imposed by police department regulations. Id. (citing Rivera v. La Porte, 896 F.2d 691 (2d Cir. 1990) and Lubsky v. T.G.& Y Stores, Inc., 749 F.2d 1423 (10th Cir 1984). Moreover, the Court in Barna stated that the fact that an officer is off-duty is "not dispositive" of whether the officer was exercising actual police authority. Id. And, "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action." Barna v. City of Perth Amboy, 42 F.3d 809 (3d Cir. 1994) (citing Griffin v. Maryland, 378 U.S. 130, 84 S. Ct. 1770 (1964). "It is irrelevant that he might have taken the same action had he acted in a purely private capacity." Id.

In Rivera v. La Porte, 896 F.2d 691 (2d Cir. 1990), a lawsuit arose from a citizen (Rivera) and an off duty New York City (La Porte) corrections officer. Id. On the day in question, while off duty, La Porte got in a scuffle with Rivera and began to push, kick, jump on Rivera and struck him with a blunt object. Id. Subsequently thereafter, La Porte yelled to Rivera that he was a police officer and that Rivera was under arrest. Id. In finding that Rivera was under "color of law" the Second Circuit of Appeals held that La Porte was authorized to

---

[7] The facts in Barna are clearly distinguishable from the incident involving plaintiff. The plaintiff in Barna was not involved in an incident with a police officer while in the presence of an alleged crime. The facts in Rivera v. La Porte, closely resembles the facts in this matter. Above all, the N.Y. Statute concerning statewide jurisdiction of police officers is similar to the statute concerning a police officer's statewide jurisdiction in the State of New Jersey. Moving defendant's interpretation of the facts of Barna as it relates to this matter is flawed and patently incorrect.

make an arrest for an offense committed in his presence under New York law and because he announced himself as a police officer. Id. Above all, the Second Circuit of Appeal Court in Rivera held that "though the dispute that precipitated the arrest was private, the response, including the arrest and excessive force, was unquestionably action under color of law." Id.

Like the New York Officer in the Rivera case, Atlantic City Police Officers have statewide jurisdiction for any crimes that occur within their presence. (See N.J. Stat.Ann. Section 40A:14-152.1; Sgt. Hanlin Dep. 89:11-15, Exhibit "I"; Chief Snellbaker Dep. 97:6-10, Exhibit "J.") Moreover, according to the testimony of Chief Snellbaker, the policymaker of the ACPD, Atlantic City Police Officers have the authority to make that arrest even if they are not on duty. (Chief Snellbaker Dep. 97:11-13, Exhibit "J.") Additionally, the ACPD's Rules and Regulations require officers to carry their service firearm or a personal firearm while wearing civilian clothing in an off-duty status <u>anywhere</u> in the State of New Jersey. (Exhibit "U.") Clearly, Defendant, Officer Jaques, had the authority to take police action anywhere in the State of New Jersey.

In this case Defendant, Officer Jaques, testified that he was driving through Medford Lakes when he came upon plaintiff who was riding his bicycle head-on in the same lane of travel, which constitutes a crime.[8] (Exhibit "G" at IA-004.) Defendant, Officer Jaques, thought he struck plaintiff with his car so he stopped. (Exhibit "G" at IA-005.) Thereafter, Defendant, Officer Jaques, rolled down his window and asked plaintiff if he was okay. (Id.) According to Defendant, Officer Jaques, plaintiff replied by threatening to kill him. (Id.) Defendant, Officer Jaques stated that plaintiff then reached inside his passenger window and grabbed him by the throat. (Id.) These alleged crimes were committed in Defendant, Officer Jaques, presence.[9]

---

[8] Plaintiff was issued a citation for this offense. (Exhibit "V.")
[9] Plaintiff, however, was not charged with any crimes resulting from the altercation with Defendant, Jaques.

Page 13

After witnessing these alleged crimes, Defendant, Officer Jaques, states that he: "informed Plaintiff that [he] was a police officer with the city of Atlantic City and ordered Plaintiff to cease and desist all further aggressive actions against [him]. [He] told Plaintiff if [plaintiff] failed to cease and desist that [he] would strike him with [his] baton that [he] had retrieved from [his] duty bag." (See Defendant Jaques' Answers to Interrogatories No. 13, attached as Exhibit "W.") Moreover, Defendant, Officer Jaques, testified that after plaintiff grabbed him by the neck, he got out of his car and identified himself as an off-duty police officer with his ID and badge. (A. Jaques Dep. 35:3-10, Exhibit "B.")

During the ensuing altercation, Defendant, Officer Jaques, struck plaintiff with a nightstick he retrieved from his duty bag. (A. Jaques Dep. 41:22-23, Exhibit "B.") His duty bag is a bag that he carries on patrol that has paperwork, extra sets of handcuffs, cleaning supplies, and other things he needs during patrol. (A. Jaques Dep. 41:24-42:2, Exhibit "B.")

There can be little doubt that from these facts a jury could conclude that Defendant, Officer Jaques, acted under color of law. Clearly, the facts of this matter closely resemble the case of Rivera v. La Porte.

### C.     STATE LAW CLAIMS

As stated in the Summary Judgment Motion of Defendant, City of Atlantic City, the "tort of negligent hiring and retentions requires that the Plaintiff show that the employer knew or has reason to know of an employee's particular unfitness, incompetence or dangerous attributes and the employer could have reasonable foreseen that these qualities created a risk of harm to others. DiCosala v. Kay, 91 N.J. 159, 173-74 (1982). Municipal corporation may be liable to individuals for active wrongdoing even if it is the result of neglect to perform, or neglect in performing, a public duty. Callan v. City of Passaic, 104 N.J.L. 643, 141 A. 778 (1928)(cited in annotations to N.J.S.A. Section 59:2-2)

Moreover, when an official with general authority in the police department sends or permits an officer without proper training or experience in handling and use of weapons they are to carry, the municipality may be liable for an injury resulting form unjustified or negligent acts and is chargeable for the officers lack of training or experience. McAndrew v. Mularchuk, 33 N.J. 172, 162 A.2d 820 (1960). Also, the hazards of a weapon is so extraordinary great that a municipality has a plain duty in its supervision of those whom it arms. Id.; see also Corridon v. City of Bayonne, 129 N.J. Super 393 (Super Court – App. Div. - 1974). As stated in Corridon, [i]f a municipality is required 'to use care commensurate with the rise' in providing adequate training and experience in the proper handling and use of weapons, as stated in McAndrew..., it certainly is no less responsible for appropriate action when situations unreasonably increase the already great hazard become known to it." Id. Thus, "the duty is one to abate such an extraordinary risk if in related circumstance danger to others is reasonably foreseeably to be perceived. Id.

All of the facts, which plaintiff cited in support of his Monell claims are pertinent here and incorporated by reference. Defendant, Atlantic City's, superficial Internal Affairs Investigations caused by its failure to train Internal Affairs Investigators and abandonment of the computerized "early warning system" with nothing in place to replace it, led to a lack of supervision and failure to discipline.

5.   CONCLUSION

For all of the foregoing reasons, Plaintiff, Paul Walker, respectfully requests that the Defendant, the City of Atlantic City's, Motion for Summary Judgment be denied and that the Plaintiff be allowed to present these facts to a jury.

                                         Respectfully Submitted,

                                         Weinstein and Associates


                                         *S/ Steven Schatz, Esquire (2265)*
                                         Steven Schatz, Esquire

                                         The Chotiner Firm


                                         *S/ L. Kenneth Chotiner, Esquire*
                                         L. Kenneth Chotiner, Esquire
                                         *Pro hac vice*