NOT FOR PUBLICATION                          [Docket No. 40]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

PAUL WALKER,

        Plaintiff,

    v.

ANDREW JACQUES, and
CITY OF ATLANTIC CITY,

        Defendants.

Civil No. 04-351 (RMB)

**OPINION**

Appearances:

Steven J. Schatz, Esquire
Weinstein & Associates
41 South Haddon Avenue
P.O. Box 642
Haddonfield, New Jersey 08033
(856) 427-6500
    Attorney for Plaintiff Paul Walker

Karen M. Williams, Esquire
Donna Lee Vitale, Esquire
Jasinski & Williams, PC
1125 Atlantic Avenue, Suite 518
Atlantic City, New Jersey 08401
(609) 348-9300
    Attorneys for Defendant City of Atlantic City

Stuart J. Alterman, Esquire
800 Kings Highway North, Suite 301
Cherry Hill, New Jersey 08034-1511
(856) 667-7338
    Attorney for Defendant Andrew Jacques

**BUMB**, United States District Judge:

**Introduction:**

This matter comes before the Court upon a motion for summary judgment by the Defendant, the City of Atlantic City (the "City"). The Plaintiff, Paul Walker, has filed opposition to the motion for summary judgment. The other Defendant in this matter, Andrew Jacques, a former police officer with the City, is not party to the instant motion.

**Statement of Facts:**

The following statement of facts are taken from the parties' separate statements of fact submitted pursuant to Local Rule 56.1. Although many of the facts are agreed to, some are disputed and will be set forth herein when relevant.

    A. <u>October 23, 2002 Incident</u>

On October 23, 2002, at approximately 1:00 a.m., the Plaintiff, Paul Walker, was riding his bicycle down Stokes Road in Medford Lakes, New Jersey to the 7-Eleven to get cigarettes. Pl.'s Dep. 43:5-44:7.[1] Plaintiff had consumed "six shots of vodka and water over a period of a few hours" prior to getting on his bicycle. <u>Id.</u> at 44:18-19. Walker was riding his bicycle on the shoulder between the white line and the grass when he observed an unmarked vehicle swerving towards him coming from the

---

    [1] Plaintiff's deposition is attached as Exhibit A ("Ex. A") to the Certification of Donna Lee Vitale, Esq. ("DLV Cert.").

2

opposite direction.  Id. 48:24-49:12.

      Plaintiff "jumped off his bike to avoid being hit" Id.
The driver of the vehicle, Defendant Jacques, slammed on the
brakes to avoid hitting the Plaintiff.  Id.[2]  Defendant Jacques,
who was intoxicated, told the Plaintiff to "get the F--- out of
the road."  Plaintiff responded "something to the effect of F---
you, I wasn't in the road, bitch." Id. 49:13-50:3

    What happened next is disputed by the parties.  Plaintiff
testified that Defendant Jacques got out of his car and ran
towards him with his hand behind him.  Id. 52:7-17.  Defendant
Jacques testified that when he got out of his car he identified
himself as an off-duty police officer with his I.D. and his
badge.  He asked the Plaintiff if he was okay in an effort to
"de-escalate" the situation.  Jacques Dep. 35:3-10.  Plaintiff
does not recall whether or not Defendant Jacques identified
himself as an off-duty police officer with his I.D. and his
badge.  Pl.'s Dep. 115:17-23.  Defendant Jacques further
testified that in addition to identifying himself as a police
officer with his identification and badge, he ordered the
Plaintiff to "cease and desist."  Jacques Dep. 34:17

    Jacques also testified that the Plaintiff reached in the
passenger side of the car and grabbed his neck.  Id. 32:11-21.

---

    [2] Plaintiff and Defendant agree that the car driven by
Jacques was not a police vehicle.  Pl.'s Dep. 52:5-6.

Jacques further testified that, in response, he ran back to the driver's side door and released the trunk so that he could retrieve his nightstick from his duty bag and defend himself. Id. at 39:14-40:3.

The parties dispute how it is that the Plaintiff was hit by defendant Jacques. Pl.'s Dep. 54:8-10 & 55:7-13. There is no dispute that Jacques struck Walker with this nightstick. Plaintiff testified that he was hit over the head with a weapon in the left frontal lobe right behind his hairline. He was "knocked down," laying on the ground and does not know if he was fully conscious. Id. 55:20-25. He then stood up and screamed at Jacques "you better hit me harder than that, bitch." Id. 56:11-12. Plaintiff then chased Jacques away from the driver's side of the car.

At about that time, two Medford Lakes police officers responded to the commotion and drew their guns at Jacques who was standing over the Plaintiff. Id. 57:15-21. The officers told Jacques to drop the weapon (the nightstick). Id.

Plaintiff sustained an injury as a result of a blow to his head by Jacques' use of the nightstick. The injuries required 11 or 12 staples and Plaintiff was subsequently diagnosed with "closed head trauma" as a result of the alleged assault. Pl.'s Ex. C.

Plaintiff was charged with operation of a bicycle upon a

4

roadway in violation of <u>N.J.S.A.</u> 39:4-14.2, which was
subsequently dismissed by the County Prosecutor's Office.  Pl.'s
Resp. SOF at ¶ 19.  Jacques was also charged with aggravated
assault, possession of a weapon for an unlawful purpose, unlawful
possession of a weapon (nightstick), consumption of an alcoholic
beverages in motor vehicle; driving while intoxicated, and
conduct unbecoming a public employee ("improper behavior").
These charges were likewise dropped.  Jacques Dep. 53:3-7.

On November 17, 2006, the City terminated Officer Jacques'
employment.  Def.'s SOF and Pl.'s Resp. at ¶ 41.

B.   <u>Prior Complaints Against Defendant Jacques</u>

In his opposition papers, Walker presents evidence of four
prior complaints (unrelated to Plaintiff) against Officer Jacques
prior to the October 23, 2002, incident.  Although the parties
dispute the characterization of the complaints, they neither
dispute the allegations that were made against Officer Jacques
nor the conclusions of the internal affairs investigations.
Copies of the complaints and the conclusions have been submitted
to the Court.  These complaints are discussed in turn below.

1.   <u>December 2001 Complaint</u>

First, the Plaintiff introduces evidence that in December
2001, Jacques was investigated for an incident involving a claim
of domestic violence with his former girlfriend, also an Atlantic

5

City Police Department Officer.[3]  An investigation was performed. As revealed during the investigation, Jacques' girlfriend had alleged that Jacques had physically abused her in the past; however, she did not wish to pursue any criminal domestic or departmental charges against the defendant.  Additionally, Jacques complained that his girlfriend was harassing him by making inappropriate phone calls.  Likewise, he did not want a restraining order.

As part of the investigation, Jacques' service weapon (nightstick), as well as an off-duty handgun, were taken from Jacques pending the conclusion of the investigation.  Both officers were then referred to the City's psychiatrist for an evaluation.  After their initial evaluations, the psychiatrist cleared both officers to return to duty, but recommended that they be required to turn in their duty weapons at the end of the day and that neither be allowed to carry a weapon off-duty.  This condition set by the psychiatrist was not acceptable to the Police Chief of the Atlantic City Police Department, Chief Snellbaker, who ordered the officers to be reevaluated.  Both officers were subsequently reevaluated, and the City psychiatrist cleared both to come back to work without any special conditions. The report concluded that the officers had been placed on

---

[3]  Defendant disputes characterizing this allegation as one of "domestic violence," although it appears to be exactly that.

different shifts and notably, would "be closely monitored by the
supervisors." See SS Cert., Ex. O.

    2.  <u>February 6, 2002 Complaint</u>

On February 6, 2002, the Defendant City of Atlantic City
received another complaint regarding Jacques.  The complainant
accused Jacques of acting unprofessionally and yelling
obscenities during a traffic stop.  According to the complainant,
Jacques attempted to get the driver's credentials and the driver
was "talking over him."  The driver admitted that he made a
remark to Jacques that he (referring to Jacques) was speeding and
Jacques stated "I don't give a shit I was speeding."  Jacques
then told the driver that he would get a ticket in the mail.  The
City investigators found "inconclusive evidence to prove or
disprove the fact that Officer Jacques may or may not have used
the word 'Shit.'"  The investigation did find, however, that
Jacques "should have called for backup to the scene and requested
a marked unit to assist."  See SS Cert., Ex. S.

    3.  <u>May 31, 2002 Complaint</u>

Additionally, on May 31, 2002, less than four months after
the incident on February 6, 2002, another complaint was filed
against Jacques.  (According to the details provided by the
Plaintiff) the complainant was pulled over in his vehicle for
having improper lamps on the undercarriage of his car.  The
complainant alleged that Jacques became antagonistic towards him

7

and allegedly told him to get out of the car so that they could "fight." Furthermore, the complainant alleged that "Jacques told him that every time he sees [the complainant] he will be issued a ticket." See SS Cert., Ex. R.

An investigation ensued. The Internal Affairs investigation exonerated Jacques but found that the "alleged incident did occur, but the actions of the officer were justified, lawful and proper." Id.

### 4.   July 19, 2002 Complaint

Less than two months later, on July 19, 2002, Jacques was accused of using excessive force in effectuating an arrest of a juvenile. According to the complaint, the victim alleged that Jacques slammed him on the ground and pulled him over to his police car during the lawful arrest of his mother. The Internal Affairs investigation concluded by exonerating Jacques of the allegation of using excessive force, finding that the "alleged incident did occur, but the actions of the officer were justified, proper and legal." See SS Cert., Ex. S.

### 5.   October 25, 2002 Complaint

Finally, on October 25, 2002, two days after the incident in question, another complaint was filed that accused Jacques of threatening to "mace" the complainant while she was handcuffed. See Exhibit X to SS Cert. The investigation failed to disclose sufficient evidence to prove or disprove the allegation.

**Applicable Standard:**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4]  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[5]  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-

_____

[4] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  See id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  See id.

[5] The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

30 (3d Cir. 1995) (citation omitted).

**Discussion:**

The Plaintiff has filed two counts against the City.  Count
Five alleges that the City violated 42 U.S.C. § 1983 based upon
its (a) custom and policy of tolerating officer misconduct, and
(b) failure to train and investigate officers.[6]  Count Six
alleges a claim of negligence.

As an initial matter, the Plaintiff concedes that he is not
seeking any emotional or punitive damages against the City and
consents to the dismissal of these claims.  Accordingly, these
claims will be dismissed.  The City also contends that the
Defendant Atlantic City Police Department is not a proper party
and, therefore, must be dismissed.  In support, the City cites to
Peschko v. City of Camden, 2006 WL 1798001 at * 7 (D.N.J. 2006),
which states that "it is well-established that in a section 1983
cause of action, police departments can not be sued in
conjunction with municipalities because police departments are
merely administrative arms of the local municipality and not
separate judicial entities."  Because Plaintiff does not dispute

----

[6]  Additionally, Plaintiff's complaint, in one conclusory
sentence in Count 5, alleges that Plaintiff's rights were
violated under §§ 1981, 1985, 1986 and 1988.  The City has moved
for summary judgment on these grounds and Plaintiff has offered
no opposition.  This failure to oppose, coupled with a failure by
Plaintiff to show that any issue of material of fact exists with
regard to these claims warrants the entry of summary judgment in
favor of the City on these grounds.

this proposition, the Atlantic City Police Department will be
dismissed.

    *a.  Section 1983 Municipal Liability*

    To state a claim for relief under § 1983, a plaintiff must
allege, first, the violation of a right secured by the
Constitution or laws of the United States and, second, that the
alleged deprivation was committed or caused by a person acting
under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48
(1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir.
1994).  In addition, local government units generally are not
liable under § 1983 solely on a theory of respondeat superior.
<u>See</u> <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 824 n. 8
(1985); <u>Monell v. Dep't of Soc. Servs</u>., 436 U.S. 658, 690-91, 694
(1978) (municipal liability attaches only "when execution of a
government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy, inflicts the injury" complained of); <u>Natale v.</u>
<u>Camden County Corr. Facility</u>, 318 F.3d 575, 583-84 (3d Cir.
2003).

    The Supreme Court in <u>Monell</u> created a two path track to
municipal liability under section 1983.  As set forth by the
Third Circuit:

> A government policy or custom can be established in two
> ways.  Policy is made when a "decision maker possessing
> final authority to establish municipal policy with
> respect to the action" issues an official proclamation,

11

policy or edict.  A course of conduct is considered to
be a "custom when, though not authorized by law, such
practices of state officials [are] so permanent and
well settled" as to virtually constitute law.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.

1990).  Thus, section 1983 liability can be established by

affirmative policies or customs.

Furthermore, custom may be established by evidence of

knowledge and acquiescence.  See Fletcher v. O'Donnell, 867 F.2d

791, 793 (3d Cir. 1989).  The key to holding a municipality

liable under a custom theory is that the policymaking official

knew, or should have known, about the illegal practices, and

therefore, tacitly authorized a custom of tolerating their

officers' supposedly illegal activities.  See Beck, 89 F.3d at

973 (discussing tacit authorization of excessive force); Allen v.

City of Philadelphia, 1997 WL 587366 (E.D. Pa. 1997).

Subsumed within the "custom" prong is inadequate police

training procedures.  The Supreme Court has held that the

inadequacy of police training may serve as the basis for section

1983 liability "only where the failure to train amounts to

deliberate indifference to the rights of persons with whom the

police come into contact."  City of Canton v. Harris, 489 U.S.

378, 388 (1989).  In City of Canton, the Court stated:

[I]t may happen that in light of the duties assigned to
specific officers or employees the need for more or
different training is so obvious, and the inadequacy so
likely to result the violation of constitutional
rights, that the policymaker of the city can reasonably

12

be said to have been deliberately indifferent to the
need.

Id. at 390.  Moreover, "[a]lthough City of Canton involved a
city's alleged failure to train its police officers, courts have
adopted the 'deliberate indifference' standard in other policy
and custom contexts."  Beck v. City of Pittsburgh, 89 F.3d 966,
972 (3d Cir. 1996).

The City argues that it is entitled to summary judgment for
the following reasons: the Plaintiff has not established that
Officer Jacques was acting under color of law, as required under
42 U.S.C. § 1983; Plaintiff has not identified any custom or
policy that caused the deprivation of the Plaintiff's
constitutional rights; and, Plaintiff has failed to set forth a
prima facie case supporting his state law claims of negligent
training, hiring, supervision, investigation and discipline.

1.   42 U.S.C. § 1983 "Color of Law"

The Court turns to the first argument presented by the City
that Officer Walker was not acting under "color of law."  The law
is settled that a plaintiff must prove that the defendant
deprived him of "any rights privileges or immunities secured by
the Constitution and laws" of the United States and that the
defendant deprived him of his constitutional right "under color
of any statute, ordinance, regulation, custom or usage of any
State or Territory[,]" that is, while acting "under color of
law."  City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 119

13

(2005)(quoting 42 U.S.C. § 1983).

The City argues that the record is devoid of any evidence that Jacques was making an arrest or that there was any legitimate police action.  Nor, Defendant contends, were the actions of Jacques consistent with conduct of an on-duty police officer because (1) the Plaintiff admits that he was not arrested by Jacques; (2) Jacques was off-duty, allegedly intoxicated and outside his jurisdiction; and, (3) Jacques was not authorized to carry the baton used to hit Plaintiff.

Acting under "color of law means acting under one's capacity as a police officer."  Graham v. Connor, 490 U.S. 386 (1989).  An off-duty police officer who purports to exercise official authority will generally be found to have acted under color of law.  Barna v. City of Perth Amboy, 43 F.3d 809 (3d Cir. 1994). As the Third Circuit has held, manifestations of "such pretended authority may include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute involving others pursuant to a duty imposed by police department regulations."  Barna, F.3d 809 at 816.  On the other hand, a police officer's "purely private acts" which are not further by any purported state authority are not acts under color of state law.  Id.

Not surprisingly, while the City attempts to characterize the October 23, 2002, incident as a "purely private incident,"

14

Plaintiff portrays the incident as one containing indicia of state authority.  There is no dispute that Officer Jacques was off-duty when the altercation with Plaintiff occurred and that Jacques was out of his official jurisdiction.  However, Plaintiff, while testifying that Jacques did not identify himself as a police officer before the arrival of the Medford Lakes police and that he was never told he was under arrest, stated that it "was apparent" the Jacques was a police officer because "I don't know anybody else that carries a night stick and that would have it so readily accessible."  Pl.'s Dep. 130:22-23 & 131:4-6.

Furthermore, Jacques testified that he informed the Plaintiff that he was, in fact, a police officer and further stated that he showed his I.D. and badge.  Jacques Dep. 35:7-10 ("I identified myself as an off-duty police officer with my ID and my badge and asked Mr. Walker if he was okay.  I tried to de-escalate the situation.").[7]  Jacques own testimony demonstrates

---

[7]   Defendant Jacques' testimony with respect to this significant fact is inconsistent.  This certainly calls into question his credibility, which is not properly before this Court.  See e.g., Hill v. City of Scranton, 411 F.3d 118, 131 (3d Cir. 2006) ("courts do not weigh evidence or determine credibility questions at the summary judgment stage.") (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  It also bears noting that the Defendant, in support of its motion for summary judgment, submits an expert opinion of Bryon K. Marshall, M.P.A., J.D., a consultant, dated February 10, 2007.  See DLV Cert., Ex. R.  In his report, Dr. Marshall states that he is "of the opinion that Jacques did not identify himself as an off-duty police officer to Walker."  See id. At page 6.

that he purported to exercise official authority.

Moreover, while Plaintiff's testimony differs, Jacques testified that when he approached the Plaintiff, he rolled down his window and asked the Plaintiff if he was okay and that Plaintiff replied by threatening to kill him and reached inside the passenger window and grabbed Jacques by the throat. Jacques Dep. 32:10-24. Such conduct, if it occurred, would constitute an assault under New Jersey law. <u>See</u> N.J. Stat. Ann. § 2C:12-1. Because a police officer may act in his official capacity outside of the his jurisdiction when making an arrest anywhere in the state for a crime committed in the officer's presence, <u>see</u> <u>Barna</u> 42 F.3d at 817, it is arguable that, pursuant to the above statutory authority, Jacques purported to act with official authority when he, again according to his <u>own</u> statement, told the Plaintiff to "cease and desist" and struck the Plaintiff with a nightstick he retrieved from his duty bag (as described by Jacques, his duty bag was a bag that he carried on patrol, in which he had paperwork, and an extra set of handcuffs, cleaning supplies, and other things he needed during patrol). Jacques

---

Such conclusory opinion is inappropriate and is an issue of credibility more appropriately left to the province of the jury. Moreover, this opinion is suspect because it contradicts the finding of the Defendant's own internal affairs investigation. When questioned by Sergeant Joseph T. Hanlin on July 31, 2006, as part of the internal affairs investigation, the defendant informed Sgt. Hanlin that "[h]e released himself from Walker's grip, exited the vehicle, and identified himself as an off-duty Atlantic City police officer." See DLV Cert., Ex. U.

Dep. 41:23-42:2.

The City relies heavily upon the decision of the Third Circuit in Barna to support their argument that Officer Jacques was not acting under the color of law.  This Court finds that the facts in Barna are clearly distinguishable from the incident involving Plaintiff.  Contrary to the facts in this case, the facts in Barna demonstrate a clearly personal family dispute.  In Barna, there was no indication that the officers in that case identified themselves as police officers, indicated that they were acting on police business or "otherwise invoke[d] their police authority. . . ."  Id. at 818.

In the instant case, there is an issue of fact as to whether Plaintiff assaulted Jacques, whether Jacques identified himself as a police officer, flashed his identification and badge, told the Plaintiff to "cease and desist."  Accordingly, construing the facts in a light most favorable to the Plaintiff, the non-moving party, this Court concludes that a jury could reasonably find that the Defendant Jacques was acting under color of law.  See e.g., Rivera v. La Porte, 896 F.2d 691, 696 (2d Cir. 1990)(finding that an off-duty officer was acting under color of law where he was authorized to make an arrest for an offense committed in his presence, was carrying department issued handcuffs, identified himself as a police officer).

17

2.  42 U.S.C. § 1983 Custom and/or Policy to Fail to
    <u>Investigate/Failure to Train</u>

The Court turns next to the City's argument that Plaintiff
cannot show any existing policy or custom that violated his
constitutional rights under section 1983.  Plaintiff's <u>Monell</u>
liability claims are based upon (1) the City's custom, of failing
to properly investigate acts of misconduct (including the
Defendant's) and (2) the City's custom of failing to properly
discipline and train its police officers, including the
Defendant.[8]

Obviously, mindful that he must identify a custom that
<u>caused</u> his injury, Plaintiff alleges that the custom of having an
inadequate investigating system in place, <u>i.e.</u>, a flawed early
warning system, led to the violation of Plaintiff's
constitutional rights.  Plaintiff further alleges that the City
failed to train, supervise and discipline its police officers
which led to the Plaintiff's deprivation of federal rights.

The City first argues that the Plaintiff has failed to point
to any facts from which a reasonable fact finder could conclude

_____

[8]  Plaintiff appears to blend his allegations together, but
the allegations should be separately analyzed.  A review of the
Complaint reveals that paragraph 37 alleges a "policy and/or
custom ... to inadequately and improperly investigate acts of
misconduct by its officers, including [the] defendant."
Paragraph 38, also alleges a policy and/or custom to
"inadequately supervise and train its police officers, including
the defendant."  The Court reads paragraph 38 as a failure-to-
train/discipline allegation.

that the City's custom of investigating complaints and training
of Internal Affairs Officers was the catalyst for the assault on
the Plaintiff.

The City points to the policies and procedures that it
alleges it had in place which were designed to prevent improper
conduct in the performance by its officers.  Specifically, the
Defendant contends that it tracked the disciplinary history of
its officers as well as had an effective early warning system.
According to the Affidavit of Tracy Ann Hines, an employee in the
Internal Affairs Unit, she receives a copy of all complaints
filed against Atlantic City police officers.  See reply
Certification of Donna Lee Vitale, Esq., ("Reply Cert. DLV") Ex.
A at 1.  She then drafts a "Complaint Brief" and immediately
sends it to the Chief of Police, County Prosecutor, and City
Solicitor.  Id. She maintains a complaint log, and when a new
complaint comes in, she logs it and "review[s] for prior
history." Id.  In addition to the "Complaint Card," she
maintains a "running sheet" on officers that have three or more
complaints.  Id.  She compares the running sheet with the
Complaint Card when any new complaints are filed.  Id.  If an
officer has three or more complaints, she drafts an Internal
Affairs Section Complaint Review Form for the Internal Affairs
Commander to review, which is then sent to the Chief of Police.
Id. at 2.

The Defendant has submitted an affidavit of Lt. Black-Taylor, assigned to Internal Affairs in May of 2000, as a Lieutenant in 2004, and made Commander of the Internal Affairs Unit in 2006, which states, in relevant part, that when an officer has more than three complaints, Ms. Hines prepares the Review Form described above "listing the Officer, dates of complaints and disposition.  The Form is approved by [her] and forwarded to the Chief with information containing the source of complaint, case number and specific charge."  Reply Cert.  DLV Ex. B at 2.  According to Lt. Black-Taylor, "[i]nvestigators would not be responsible for reviewing the officer's complaint card to determine if there was any pattern of misconduct as that responsibility is assigned to Tracy Hines and the Internal Affairs commander."  Id.

The Plaintiff counters with evidence to dispute the adequacy of the Defendant's warning system.  Specifically, the Plaintiff has introduced the testimony of the Chief of the Police Department, Chief Arthur Snellbaker, which characterized the computerized early warning system as "an unmitigated disaster." Snellbaker Dep. at 129:9-10.  According to the testimony of Chief Snellbaker, the employee in charge of the system could not get it to work right.  Chief Snellbaker further testified that the "computerized early warning system was abandoned. . . in fairly short order. . . ."  Id. at 130:4-9.  However, as set forth

20

above, the Defendant City considered the review conducted by
Hines to be its early warning system.  See Reply Cert., Ex. A.
But Plaintiff also criticizes the so-called early warning system
described by Hines and cities to the pervasive failure of the
City to follow its on procedures.

According to Chief Snellbaker, the Atlantic City Police
Department followed the internal affairs policies and procedures
directly from the New Jersey Attorney General Guidelines (the
"Guidelines").  Indeed, Chief Snellbaker testified that the
police department followed them verbatim.  Snellbaker Dep.
130:19-20.  As set forth in the Guidelines, "[a]n early warning
system should be designed to identify any pattern or practice by
any member of the agency which warrants intervention or
remediation before it develops into a glaring problem."  SS Cert.
Ex. L at 1-2.  Moreover,

> Given the complexity of officer performance data, it is
> best suited to [do a review] by a computerized system
> that can be equipped with algorithms to reveal the
> presence of a particular patterns of incidents.
> However, not all law enforcement have the computer
> capabilities for such an in-depth screening process.
> At a minimum, every law enforcement agency should
> review all internal complaints made against is
> officers, regardless of outcome, for evidence of a
> pattern.

Id. at 2.

Plaintiff's claim rests solely on the assertion that "the
abandonment of the early warning system demonstrates a deliberate

indifference to a citizen's civil rights."  (Opp. Brief at p. 10)
The record before this Court, however, does not support the
Plaintiff's claim.  What it does show is that the computerized
early warning system was faulty and the City took alternative
measures.  Moreover, the record before this Court does not evince
evidence that the action taken by the City, i.e. abandonment of
the early warning system, was the "moving force behind his
alleged injuries." Bryan County, at 400 & 404. ("a plaintiff
must show that the municipal action was taken with the requisite
degree of culpability and must demonstrate a direct causal link
between the municipal action and the deprivation of federal
rights.").  Therefore, Defendant is entitled to summary judgment
as to this aspect of Plaintiff's claim.

The Plaintiff also alleges that the City failed to train,
supervise and discipline its officers.  Plaintiff focuses
particularly on the City's alleged failure to train Internal
Affairs investigators and discipline Jacques.  Plaintiff contends
that this case fits within the parameters established by the
Supreme Court in City of Canton v. Harris, 489 U.S. 378 (1989).
In Canton, the Supreme Court held contact.  In City of Canton,
the Court stated:

> [I]t may happen that in light of the duties assigned to
> specific officers or employees the need for more or
> different training is so obvious, and the inadequacy so
> likely to result the violation of constitutional
> rights, that the policymaker of the city can reasonably
> be said to have been deliberately indifferent to the

need.

Id. at 390.

The City repeatedly argues that no liability can be found because there was no pattern of constitutional violations by Jacques.  It is possible, however, to maintain a failure to train claim without such a pattern, though the burden is high.  Berg v. County of Allegheny, 219 F. 3d 261, 276 (3d Cir. 2000).  As stated in Bd. of Cty. Commissioners of Bryan Cty. v. Brown, 520 U.S. 397, 409 (1997),

> In leaving open. . . the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice.

Id. at 409.

To support his failure to train/discipline claim, Plaintiff relies on the following.  First, Jacques was investigated in December of 2001 for an incident involving a claim of domestic violence with his former girlfriend who was also an Atlantic City Police Department Officer.  As part of that investigation, the girlfriend had alleged that the Defendant had physically abused her.  Both officers were sent for an evaluation, and it was

23

recommended to the Police Department that they turn in their weapons at the end of the shift.  As further recommended by the City psychiatrist, neither be allowed to carry a weapon off-duty. The Chief of the Police Department ordered the officers to be reevaluated within one week of the City psychiatrist's orders at which time, upon further reevaluation, both were cleared to return to work without any special restrictions.

Shortly after that incident, on February 6, 2002, Jacques was accused of acting unprofessionally and yelling obscenities during a routine traffic stop which again resulted in a complaint and investigation.  Although that complaint was not sustained, meaning the investigation failed to disclose sufficient evidence to clearly prove or disprove the allegation, the investigators found that Jacques should have called for backup to the scene and requested a marked unit to assist.

Within a matter of a few months, the department again received a complaint involving Jacques wherein the complainant stated that Jacques told him to get out of his car so they could fight.  After an investigation, Jacques was exonerated.  In other words, it was determined that the incident did occur but that the actions of Officer Jacques were justified.

Clearly, the Plaintiff has offered evidence of a series of actual written complaints that appear to be similar in nature containing specific information pertaining to the inability of

24

Jacques to control his temper or use verbal skills properly. These complaints, even including the October 25, 2002 event, which may still have evidentiary value for a jury's consideration, exhibit a pattern of a volatile, even short-fused, officer.  Indeed, the Defendant's own reports demonstrate the events did occur, but were justified.  Yet, the record is devoid of any disciplinary action or training of any sort by the City to address this pattern.  Moreover, following the incident with Jacques and his girlfriend, a report by Sgt. Hanlin clearly states that Jacques would be "closely monitored by the supervisors."  SS Ext. O at 3.  The record is devoid of any such close monitoring, i.e., training, done by the City.

     Additionally, at the time in question, and presumably, during the times of the prior complaints against Jacques, an uncle of his, Sergeant McCausland was a member of the Atlantic City Police Department's Internal Affairs Unit.  Giving all reasonable inferences to the non-moving party, there is certainly an inference that can be drawn that the investigators gave more credence to Officer Jacques because Sgt. McCausland was a part of their unit.  Indeed, Sgt. McCausland participated in the October 25, 2002 investigation.  See Ex. X at 12.  Certainly, a jury could reasonably infer that, in allowing this, the City turned a "blind-eye" and was deliberately indifferent to Jacques' behavior.

25

Moreover,

> the existence of a pattern of tortious conduct by
> inadequately trained employees may tend to show that
> the lack of proper training, rather than a one-time
> negligent administration of the program or factors
> peculiar to the officer involved in a particular
> incident, is the "moving force" behind the plaintiff's
> injury.

Bryan Cty., 520 U.S. at 407-08.

Based on the foregoing, and construing all reasonable inferences in favor of the non-moving party, a jury could conclude that the Defendant's violation of Walker's federal rights was a highly predictable consequence of Defendant's failure to properly handle recurring situations through training or discipline Officer Jacques.  See Bryan Cty., 520 U.S. at 409-10 ("stating that a high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable.").  Also, "it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future." Bielevicz v. Dubinon, 915 F. 2d 845, 851 (3d Cir. 1990).

Accordingly, for the reasons set forth above, this Court finds that there are genuine issues of material fact relating to Plaintiff's Monell claim for failure to train and discipline Jacques.  Therefore, the City's motion for summary judgment will therefore be denied as to this claim.

26

In addition, the same reasons discussed above reveal that genuine issues of material fact also remain with regard to Plaintiff's state law claims for negligent training and monitoring claim.  There is sufficient evidence from which a reasonable jury could decide that the City was aware of Jacques unfitness, incompetence or dangerous attributes.  Therefore, summary judgment will also be denied as to Count Six of Plaintiff's complaint.

**Conclusion:**

For the aforementioned reasons, the City's motion for summary judgment will be granted to the extent Plaintiff has brought a claim pursuant to Section 1983 for failure to maintain an adequate warning system or train internal affairs officers, it will also be granted with regard to Plaintiff's Section 1981, 1985, 1986 and 1988 claims.

The City's motion is denied with regard to Section 1983 liability for failure to train or discipline Officer Jacques and with regard to Plaintiff's negligent training and monitoring claim in Count Six.

An accompanying Order will issue this date.

Dated: July 23, 2007                    s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        United States District Judge